UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
MAVERICK FUND, L.D.C., MAVERICK FUND
USA, LTD., MAVERICK FUND II, LTD.,
MAVERICK NEUTRAL FUND, LTD., MAVERICK
NEUTRAL LEVERED FUND, LTD., MAVERICK
LONG FUND, LTD., AND MAVERICK LONG                MEMORANDUM AND ORDER
ENHANCED FUND, LTD.,

                        *Plaintiffs*,                              10-CV-4436 (JG) (JO)

            vs.

COMVERSE TECHNOLOGY, INC., JACOB
ALEXANDER, DAVID KREINBERG, WILLIAM F.
SORIN, JOHN H. FRIEDMAN, RON HIRAM, SAM
OOLIE, ANDRE DAHAN AND AVI ARONOVITZ,

                        *Defendants*.

------------------------------------------------------------------ X
A P P E A R A N C E S :

        DIETRICH SIBEN THORPE LLP
                2173 Salk Avenue
                Suite 250
                Carlsbad, CA 92008
        By:     David Andrew Thorpe, Edward P.
                Dietrich and Matthew Philip Siben
                *Attorneys for Plaintiffs*

        WEIL, GOTSHAL & MANGES, LLP
                767 Fifth Avenue
                New York, NY 10153
        By:     Joseph S. Allerhand
                *Attorneys for Defendants Comverse*
                *Technology, Inc. and Avi Aronovitz*

        MORVILLO, ABRAMOWITZ, GRAND,
                IASON & SILBERBERG, P.C.
                565 Fifth Avenue
                New York, NY 10017
        By:     Jeremy Hugh Temkin
                *Attorneys for Defendant Jacob Alexander*

DECHERT LLP
>1095 Avenue of the Americas
>New York, NY 10036

By: David S. Hoffner and Robert W. Topp
>*Attorneys for Defendant David Kreinberg*

LAW OFFICE OF SOLOMON N. KLEIN
>1410 Broadway
>Suite 1802
>New York, NY 10018

By: Solomon N. Klein
>*Attorneys for Defendant William F. Sorin*

LAW OFFICES OF THOMAS P. PUCCIO
>230 Park Avenue
>Suite 301
>New York, NY 10169

By: Thomas P. Puccio
>*Attorneys for Defendant William F. Sorin*

KRAMER LEVIN NAFTALIS & FRANKEL
>LLP
>1177 Avenue of the Americas
>New York, NY 10036

By: Arthur H. Aufses, III
>*Attorneys for Defendants John H.*
>*Friedman and Sam Oolie*

BAKER BOTTS, LLP
>30 Rockefeller Plaza
>44th Floor
>New York, NY 10112

By: Seth T. Taube
>*Attorneys for Defendant Ron Hiram*

PROSKAUER ROSE
>Eleven Times Square
>New York, NY 10036

By: Gregg M. Mashberg and Sigal Pearl
>Mandelker
>*Attorneys for Defendant Andre Dahan*

JOHN GLEESON, United States District Judge:

This case arises out of claims brought by a group of seven hedge funds that purchased and sold millions of shares of Comverse Technology, Inc. ("Comverse" or "the Company") stock between 2001 and 2007. Plaintiffs previously opted out of a $225 million settlement of a related shareholder class action against Comverse ("the Class Action"), and now bring this action to pursue claims under Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, and New York common law. Defendants move to dismiss all of plaintiffs' claims. For the reasons stated below, defendants' motion to dismiss plaintiffs' Exchange Act claims and negligent misrepresentation claim against Comverse, Alexander, Kreinberg, Sorin, Friedman, Hiram and Oolie is granted insofar as plaintiffs' claims are based on defendants' 2007 statements and denied in all other respects. Defendants' motion to dismiss plaintiffs' negligent misrepresentation claim against Dahan and Aronovitz is granted.

## BACKGROUND

The following allegations, taken from plaintiffs' complaint, are accepted as true for purposes of defendants' motion to dismiss.

Plaintiffs are a group of seven hedge funds (collectively referred to as "Maverick") that purchased shares of Comverse stock in 2005, 2006 and 2007. Defendants are Comverse, its officers, and members of its Compensation and Audit Committees. Comverse is a leading provider of software and systems that enable network-based communications service providers to offer enhanced communications services to their customers. Jaboc "Kobi" Alexander served as Chairman of Comverse's Board of Directors from September 1986 until his resignation on May 1, 2006, and also served as the Company's CEO from April 1987 until his

resignation. David Kreinberg was the Company's CFO from May 1999 until his resignation on May 1, 2006. William Sorin served as General Counsel and then Senior General Counsel from October 1984 until his resignation on April 28, 2006. Alexander, Kreinberg and Sorin are collectively referred to as the "Officer Defendants." John H. Friedman served as a Director of Comverse from June 1994 through April 2007. Throughout the period from April 30, 2001 through November 14, 2006, Friedman served as Chairman of the Compensation Committee and as a member of the Audit Committee. Ron Hiram was a Director of Comverse from 1986 to 1987 and again from June 2001 through December 2006. Throughout the relevant period, Hiram was a member of the Compensation Committee and Chairman of the Audit Committee. Sam Oolie was a Director of Comverse from May 1986 through April 2007, and throughout that period, he served as a member of the Compensation Committee and the Audit Committee. Friedman, Hiram and Oolie are collectively referred to herein as the "Compensation/Audit Committee Defendants" or the "CAC Defendants." Andre Dahan has served as President, CEO and a member of the Board of Directors of Comverse from April 2007 through the present. Avi Aronovitz served as Comverse CFO from April 2006 through June 2008. Defendants Dahan and Aronovitz are collectively referred to as the "New Management Defendants."

A. *The Stock Option Backdating Scheme*

According to the complaint, stock options and backdating, as relevant to the allegations in this case, function as follows.

Stock options enable employees to purchase company stock for a limited period of time at a specific price called the "exercise price." When the employee exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's

4

price at the time the option is exercised.  The exercise price is determined by the closing price of the stock on the "grant date."

A key purpose of employee stock options is to give employees an incentive to increase shareholder value by allowing them to benefit from an increase in the market price of the stock that occurs after the options are awarded.  This purpose may be accomplished by awarding employees "at the money" stock options, meaning that the exercise price is equal to the market price of the stock at the time the option is awarded.  When the grant date of an option is backdated to a date when the market price of the company's stock was lower than the current market price, the option is said to be "in the money" at the time the option is awarded because the exercise price is lower than the market price of the stock.  While backdated "in-the-money" options still provide employees with an incentive to increase shareholder value, they also create an instantaneous paper profit for the option awardee.  Options backdating is not illegal, but it must be accounted for correctly in a company's financial statements and properly disclosed to a company's shareholders.

Plaintiffs allege that, during the relevant period, Comverse granted stock options to the Officer Defendants and other employees pursuant to four different stock option plans (the "Plans").  Defendant Sorin drafted the Plans, which were approved by the Compensation Committee and then submitted to the Company's shareholders for approval by proxy vote.  The Plans allowed for two types of stock options:  (1) "incentive options" (as defined by § 422 of the Internal Revenue Code) and (2) "non-qualified options," which had different tax consequences.  The Incentive Plan expressly provided in part:

> The exercise price of Incentive Stock Options must not be less than the price of a share of Common Stock on the NASDAQ National Market System ("Fair Market Value") on the grant date.

(Compl. ¶ 51.)  While the Plans allowed Comverse to grant "in-the-money" stock options for non-qualified grants, the Company represented that it never did so.

Comverse accounted for stock options using the method described in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), under which employers were required to record as an expense on their financial statements the "intrinsic value" of a stock option on its "measurement date."  The measurement date, as defined by APB 25, is the first date on which the number of options that an individual employee is entitled to receive and the exercise price are known.  If an option is "in the money" on the measurement date, the difference between its exercise price and the (higher) quoted market price must be recorded as a compensation expense to be recognized over the vesting period of the option.  Options that are "at the money" on the measurement date need not be expensed.

In its Form 10-Ks filed with the SEC throughout the relevant period, Comverse consistently represented that its stock options had been accounted for in a manner consistent with GAAP.  This was not true.  In fact, the exercise prices for options granted through the end of 2001 (and which vested through 2005) were less than the fair market value of the underlying shares on the dates the grants were actually made, meaning that compensation expenses should have been recognized by the Company in connection with its stock-based compensation plans.  Because Comverse did not record the difference in price as compensation, it did not account for the stock option grants in a manner consistent with GAAP.  Comverse's failure to account for the difference between the fair market price and the actual exercise price not only impacted the Company's financial results, but also impacted its taxable income.

Plaintiffs allege that all defendants, with the exception of the New Management Defendants, were involved in the backdating scheme. Alexander directed and controlled the option grant process, initiated the backdating scheme, and personally chose the number of options to grant to himself and other senior officers. He selected the grant date by looking back at Comverse's historical stock prices and choosing a date on which Comverse's stock was trading at a relatively low price. Sorin advised the Compensation Committee and played a critical role in the scheme by drafting grant documents with backdated grant dates. Specifically, he, or someone acting at his direction, sent to the Compensation Committee members draft unanimous written consent forms containing "as of" dates. Those forms falsely indicated for each grant that corporate action sufficient to approve the grants had taken place on those "as of" dates when those dates had actually been determined after-the-fact in order to obtain a low exercise price. Starting no later than 1998, Kreinberg assisted Alexander in the scheme by, among other things, working with Alexander to select the backdated grant dates. The Compensation Committee approved the grants pursuant to the documents containing backdated grant dates. However, when the members of the Compensation Committee returned their individual copies of the consents to Sorin, they returned copies that had been signed but not dated. The Audit Committee was responsible for, among other things, overseeing the Company's financial reporting process and overseeing the Company's compliance with legal and regulatory requirements.

Overall, between 1991 and 2001, there were at least twenty-six backdated option grants to Comverse employees and employee-directors, including the Officer Defendants. The backdating scheme allowed the defendants to disguise the fact that the Company was paying higher compensation to executives and employees by awarding them in-the-money options. By

doing so, the Company was able to avoid having to expense the in-the-money portions as a compensation expense and thus avoid reductions to the Company's net income and earnings per share.

Between 1991 and March 14, 2006, Comverse did not make any public disclosures regarding its backdating of options. To the contrary, the Form 10-Ks that Comverse filed with the SEC throughout the relevant period stated that its stock options had been accounted for in a manner consistent with GAAP. The defendants also concealed the existence of the backdating of options from the Company's outside auditors, Deloitte & Touche.

B. *Additional Accounting Claims*

Plaintiffs contend that the scheme was not limited to backdating stock options, alleging that it also included manipulating the published financial results to give the appearance that the Company was well managed. In order to accomplish this result, Alexander directed Kreinberg to make adjustments to quarter-end reserve accounts to create desired earnings per share, and to move expenses from one category to another as a way of ensuring that the Company's expenses would appear to grow in a measured and consistent manner. Alexander also directed Kreinberg to manipulate the sales backlog figures the Company reported in its annual reports on Form 10-K and to analysts in order to report numbers consistent with what Alexander believed Wall Street investors would view favorably. According to the SEC, Comverse's "fraudulent scheme . . . involved several improper earnings management practices that were not in conformity with GAAP." (*Id.* ¶ 129.)

Kreinberg and Alexander's accounting manipulations impacted reported financial results from 1996 through 2006, and the scope of the accounting fraud continues to prevent the Company from meeting its obligations to file restated and current financial statements with the

SEC. As Dahan, Comverse's current CEO, recently described the problem: "The fraud was everywhere, in every accounting area of the Company." (*Id.* ¶ 127.)

C. *Disclosures*

On March 14, 2006, Comverse announced in a press release that its Board of Directors had formed a Special Committee of independent directors to investigate "the accuracy of the stated dates of option grants and whether all proper corporate procedures were followed." (Compl. ¶¶ 15, 134; Ex. H (3/14/2006 Comverse Form 8-K.) In response to this disclosure, plaintiffs allege that the price of Comverse stock fell $4.30 per share, losing 14.7% of its value on a single day of trading.

After reviewing Comverse's March 14, 2006 press release, representatives of Maverick spoke directly with Friedman later that same day. Friedman, in his capacity as a Comverse Director and Chairman of the Compensation Committee and a member of the Audit Committee, reassured representatives of Maverick that any problems at Comverse were strictly limited to stock option backdating similar to that being reported to have occurred at numerous other technology companies.

Over the course of the next few days, more information about the backdating allegations became available. On March 16, Standard & Poor's put Comverse on "credit watch" as a result of concerns about the Company's backdating scandal. That same day, the price of Comverse stock fell from $25.04 to $24.32, a drop of 2.88%. On March 18, *The Wall Street Journal* published an article discussing the suspicious timing of options awards for executives at a number of companies, including Comverse. On the next trading day after the article, the price of Comverse stock fell from $24.29 to $22.87, a drop of 5.85%.

One month later, on April 17, 2006, Comverse publicly reported "that it had engaged in improper backdating" of stock options and that it would restate its 2001-2005 financial statements. (*Id.* ¶¶ 144, 145; Ex. I (4/17/2006 Comverse Form 8-K).) The company warned investors that they should not rely on its prior financial statements, stating that "such financial statements and any related reports of its independent registered public accounting firm should no longer be relied on." (*Id.* ¶ 144; Ex. I.) The Company also reported that it would not timely file its Form 10-Q for its second quarter ending July 31, 2006, and that its investigation was still ongoing. But the Company reassured investors that the accounting impact of the backdating scheme would not change the reported operating cash results of the Company. Specifically, it stated: "The Company does not expect that the anticipated restatements would have a material impact on its historical revenues, cash position or non-stock option related operating expenses." (*Id.* ¶ 146; Ex. I.) Over the next two days of trading following the April 17 disclosure, the price of Comverse stock fell from $24.20 to $22.94, a drop of 5.21%.

On May 1, 2006, Comverse announced the resignation of its CEO (Alexander), CFO (Kreinberg) and General Counsel (Sorin). On May 4, 2006, Comverse publicly reported that it had received a subpoena from the Department of Justice ("DOJ") seeking records relating to its stock option grants between 1995 and 2006. That night, the *Wall Street Journal* web site reported that the DOJ had opened a criminal investigation into stock option backdating at Comverse. The next day, the price of Comverse shares fell from $24.03 to $22.98, a drop of 4.37%.

Over the next several months, more information regarding the effects of the options backdating scheme on the Company continued to emerge. On June 12, 2006, Comverse announced it would be unable to file its Form 10-Q for the quarter ended April 30, 2006. On

August 9, 2006, defendants Alexander, Kreinberg and Sorin were all charged in a criminal complaint related to the alleged backdating of stock options. On November 14, 2006, the Company issued a press release warning that it had "identified errors in the recognition of revenue related to certain contracts, errors in the recording of certain deferred tax accounts and the misclassification of expenses in earlier periods." (Compl. ¶¶ 21, 166, Ex. N (11/17/2006 Comverse Form 8-K.) The release further stated: "The Special Committee's investigation continues, and the Company is unable to estimate the effect of the other accounting issues on its previously issued financial statements or the time it will take to complete the necessary restatements." (*Id.*)[1]

Between September 12, 2006 and October 4, 2006, plaintiffs sold all of their Comverse shares.

On February 1, 2007, NASDAQ suspended trading in Comverse stock, and on June 1, 2007, it delisted the stock. Comverse stock has traded only in the over-the-counter securities market since February 1, 2007.

D. *New Management Reassurances*

Upon becoming the Company's CEO in April 2007, Dahan set out to reassure the market that Comverse could regain compliance with SEC regulations and file current, audited financial statements. On June 11, 2007, in a press release subsequently filed on Form 8-K with the SEC and signed by the Company's general counsel and Chief Operating Officer, Paul L. Robinson, the Company stated: "The company expects to become current in its filings with the Securities and Exchange Commission by the end of fiscal 2007." (*Id.* ¶ 170.) Dahan made

---

[1] The complaint does not allege loss causation dates between June 12, 2006 and October 4, 2006, and plaintiffs do not seek damages for shares purchased between June 12, 2006 and August 30, 2007.

similar reassuring statements on analyst conference calls on June 20, 2007 and September 10, 2007, as well as on conference calls with plaintiffs as late as October 23, 2007.  Aronovitz also participated in the June 20, 2007 and September 10, 2007 conference calls, and, at least on the June 20, 2007 call, reaffirmed the expectation that Comverse would be current with its SEC filings by the end of fiscal 2007.  Relying upon the reassurances of the New Management Defendants, plaintiffs resumed purchasing Comverse shares on August 31, 2007.

On November 5, 2007, the Company disclosed that it would not be able to restate its financial results by the end of fiscal year 2007 because of rampant accounting improprieties. On the next trading day, the price of Comverse stock dropped from $19.25 to $17.49, a drop of 9.14%.

E.  *Procedural History*

On April 19, 2006, a Comverse shareholder filed a putative class action against all of the current defendants, with the exception of the New Management Defendants, as well as several other defendants who are not parties in this case.  *Caiafa v. Comverse Technology, Inc. et al.* (*In re Comverse Tech., Inc. Sec. Litig.*), 06-cv-1825 (NGG)(RER).

On June 30, 2007, the defendants in that action moved to dismiss the Class claims on numerous grounds.  Magistrate Judge Ramon Reyes issued a Report and Recommendation on October 31, 2007 recommending that the motion be denied with respect to several of the lead plaintiffs' claims.  Judge Reyes reasoned that the April 17, 2006 disclosure "did not fully warn plaintiffs of what the company would eventually reveal."  (06-cv-1825 D.E. 135, at 51.)  On February 20, 2008, Judge Nicholas G. Garaufis adopted the report and recommendation. Agreeing with Judge Reyes, Judge Garaufis held that the April 17, 2006 disclosure did not foreclose the possibility of liability for losses after that date because "the April 17, 2006 Press

12

Release may not have been intensive or credible enough to counter-balance effectively Comverse's previous misstatements." *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 150 (E.D.N.Y. 2008). Judge Garaufis also held that the lead plaintiffs' complaint gave rise to a strong inference of scienter with regard to the CAC Defendants – Friedman, Oolie and Hiram.

Following Judge Garaufis's denial of defendants' motion to dismiss, defendants agreed to settle the Class Action for $225 million on behalf of the Class. After receiving notice of the proposed settlement, Maverick opted out of the Class. Because Maverick's purchases of Comverse stock during the class period were sufficiently large to allow Comverse to terminate the proposed settlement, as per the terms of a Supplemental Agreement between Comverse and the lead plaintiffs on behalf of the Class, the parties agreed to a reduce the settlement amount by $6.25 million, representing Maverick's *pro rata* share of the settlement.

On September 28, 2010, plaintiffs filed this action, alleging violations of Sections 10(b), 18 and 20(a) of the Exchange Act and Rule 10b-5. Plaintiffs also bring a claim under New York law for negligent misrepresentations. The Section 10(b), Rule 10b-5 and Section 18 claims are brought against Comverse and all of the individual defendants except the New Management Defendants. The Section 20(a) claim is brought against all of the individual defendants except the New Management Defendants. The negligent misrepresentation claim is brought against all defendants.

Defendants now move to dismiss all of plaintiffs' claims.

DISCUSSION

A. *The Rule 12(b)(6) Legal Standard*

   To survive a motion under Rule 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A claim is facially plausible only if the pleaded facts permit a court to reasonably infer that the plaintiff is entitled to relief. *Id.* In evaluating plaintiffs' claims, I construe the complaint liberally, accepting its well-pled factual allegations as true and drawing all reasonable inferences in favor of the non-moving parties. *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Although the complaint must be supported by more than "mere conclusory statements," *Iqbal*, 129 S. Ct. at 1949, it need not provide "detailed factual allegations." *Bell Atlantic Corp. v .Twombly*, 550 U.S. 544, 555 (2007).

B. *Plaintiffs' Exchange Act Claims Are Plausible*

   Plaintiffs bring claims under Sections 10(b), 18 and 20(a) of the Exchange Act. In order to state a claim under Section 10(b) and Rule 10b-5(b), a "plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000). In order to state a claim under Section 18, a plaintiff must plead actual, as opposed to presumed, reliance upon a false or misleading statement contained in any document or report filed with the SEC pursuant to the Exchange Act. *Heit v. Weitzen*, 402 F.2d 909, 916 (2d Cir. 1968); *see also In re Suprema Specialties, Inc., Sec. Litig.*, 438 F.3d 256, 283 (3d Cir. 2006). However, the plaintiff does not bear the burden of proving that the defendant acted with

14

any particular state of mind in order to prevail on a Section 18 claim.  *In re Suprema Specialties, Inc., Sec. Litig.*, 438 F.3d at 283; *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 193 (1st Cir. 2005); *Magna Inv. Corp. v. John Does One Through Two Hundred*, 931, F2d 38, 39-40 (11th Cir. 1991).  Section 20(a) makes control persons jointly and severally liable for primary violations by the controlled person unless the controlling person can show that he or she acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996).

Defendants argue that plaintiffs have failed to state a plausible claim for relief under any of the above sections of the Exchange Act because plaintiffs' sophistication and trading patterns render it implausible that Maverick will be able to prove reasonable reliance or loss causation.  In particular, defendants point to two specific aspects of plaintiffs' allegations that render their claims implausible:  (1) their "in-and-out" trading of Comverse stock; and (2) their repeated purchase of Comverse stock after adverse information was released about the Company.

### 1.  *In-and-Out Trading*

Defendants contend that the "in-and-out" trades are highly suggestive of "program trading," and thus negate plaintiffs' proffered theory that they were harmed by defendants' alleged misstatements or omissions.  Although the trading data provided by plaintiffs lists approximately 1,400 trades in Comverse stock between August 13, 2001 and January 2, 2008, the defendants do not specifically state what it is about plaintiffs' trades that makes plaintiffs' theory of recovery inherently implausible.  If the defendants mean to suggest that plaintiffs' claims are implausible because of the sheer number of trades in which plaintiffs engaged, that suggestion finds no support in logic or case law.  If they mean to suggest that

plaintiffs did not hold onto Comverse stock for long enough to suffer any damages when the price of Comverse stock declined, the argument is not supported by the trading data. Plaintiffs frequently traded Comverse stock multiple times in a day, but it does not appear that they closed out their position in Comverse stock so quickly after purchasing shares that they were able to avoid losses when the price of the stock declined. Instead, it appears that Maverick held its Comverse shares for months at a time, and that numerous transactions in Comverse stock were actually transfers of shares between Maverick funds with no net purchases or sales. Based on a preliminary review of plaintiffs' trading data, I conclude that it is not implausible that plaintiffs held shares of Comverse stock for long enough periods of time to suffer significant losses when the price of Comverse stock declined.

Finally, if by "program trading" the defendants mean that plaintiffs engaged in the trading of securities based entirely on their price in relation to each other, and not on the underlying fundamentals of the company whose stock is being traded (including any publicly available information about the company), the argument is not persuasive because plaintiffs have adequately pled reasonable reliance on defendants' material misstatements. *See infra* Part E.

### 2. *Stock Purchases After the Company Reported Adverse Information*

Second, defendants argue that Maverick repeatedly purchased Comverse stock after (and sometimes on the same dates) that the Company and the financial press reported adverse information about Comverse and its stock. But this argument ignores plaintiffs' allegations that Comverse continued to withhold material information regarding the Company, and that defendants' partial disclosures did not reveal the full scope of the fraud until January 2008. Assuming plaintiffs' allegations are true, it is plausible that they continued to trade in Comverse stock after defendants' disclosures because they were still being defrauded by

16

defendants' material misstatements and omissions.  *See Converse*, 543 F. Supp. 2d at 150.

Plaintiffs have alleged that the price of Comverse stock was still artificially inflated subsequent

to the partial disclosures by defendants, and that the misstatements and omissions caused them

harm.  Their claims are no less plausible because they continued to purchase Comverse shares

after the release of negative information about the Company caused the price of Comverse shares

to decline.

C.  *Failure to Plead the Dates and Prices of Stock Purchases and Sales*

The defendants argue that plaintiffs' claims should be dismissed because the

complaint does not plead the dates and prices of their stock purchases and sales as required by

Rule 9(b) of the Federal Rules of Civil Procedure.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances

constituting fraud or mistake shall be stated with particularity.  Motive, intent, knowledge, and

other conditions of mind of a person may be averred generally."  To satisfy the pleading

requirements of Rule 9(b), a complaint must "(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were

made, and (4) explain why the statements were fraudulent."  *Shields v. Citytrust Bancorp, Inc.*,

25 F.3d 1124, 1128 (2d Cir. 1994).  Rule 9(b) is intended to serve several purposes:  to provide a

defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from

improvident charges of wrongdoing, to protect a defendant against the institution of a strike suit,

and to discourage the filing of complaints as a pretext for discovery of unknown wrongs.  *Wood*

*ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 Fed. Appx. 744, 747 (2d Cir. 2009) (citing

*O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) and *Madonna v.*

*United States*, 878 F.2d  62, 66 (2d Cir. 1989)).

The complaint in this case provides sufficient information regarding which of the defendants' statements were allegedly fraudulent, who made those statements, where and when those statements were made and why they were fraudulent. Plaintiffs also allege that they purchased shares of Comverse stock after each of the alleged fraudulent statements was made, and that they were injured when the share price of the stock declined following numerous partial disclosures of the fraud.

Defendants rely on several cases where courts have found that plaintiffs failed to satisfy the requirements of Rule 9(b) because they did not plead specific details regarding all purchases and sales of securities. (Comverse's Mem. Law Supp. Mot. Dismiss at 12-13 (citing *Barr v. McGraw Hill, Inc.*, 710 F. Supp. 95 (S.D.N.Y. 1989), *Gross v. Diversified Mortg. Investors*, 431 F. Supp. 1080 (S.D.N.Y. 1977) and *Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (S.D.N.Y. 2010))). But in those cases the failure to plead the details of purchases or sales of securities made it impossible for the courts to figure out what conduct was alleged to be fraudulent or whether the injury alleged was suffered "in connection with the purchase or sale of securities," as required by Section 10(b) and Rule 10b-5. Here, plaintiffs provide ample details concerning which statements are alleged to be fraudulent and why. They further allege that they bought and sold shares of the Company's stock on a public exchange over the entire period of the alleged fraud. In the context of this case, I conclude that the plaintiffs are not required to plead the specific details of each purchase and sale of Comverse stock during the relevant period. The specifics of when plaintiffs made trades and at what prices those trades were made, while relevant to the issue of damages, is not a matter of concern at this stage.

D. *Loss Causation*

The defendants argue that plaintiffs have failed to adequately allege loss causation, which is a required element of plaintiffs' Exchange Act claims.

To adequately allege loss causation, a plaintiff must do more than simply allege the purchase of a security at an artificially inflated price. Rather, a plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm. v. Broudo*, 544 U.S. 336, 347 (2005). A plaintiff must also allege that it suffered losses when the market price of the stock declined, and that the decline was caused by the fraud, not other market factors. *Id.* at 342-43.

The defendants rely on *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187 (S.D.N.Y. 2006), in arguing that plaintiffs do no more than formulaically plead that they suffered "economic losses" because they purchased stock at artificially inflated prices and that, "as a direct and proximate result of Defendants' wrongful conduct," plaintiffs were "damaged by the loss of their investment." *Id.* at 194. However, in *Joffee*, the plaintiffs' failure to adequately allege loss causation went well beyond their failure to allege the specific dates that they purchased and sold stock. The court in that case found that plaintiffs' reliance on analyst reports that were not true opinions could not have caused plaintiffs' losses because (1) the truth regarding the nature of the reports "was not disclosed, if ever, until years after plaintiffs [sic] losses were realized," and (2) the underlying facts that the reports relied on were "never concealed." *Id.* at 193-94. Because the complaint in *Joffee* did not provide "any indication of the economic loss and proximate cause that the plaintiff has in mind," plaintiffs had not adequately pled loss causation. *Id.* at 194 (citing *Dura*, 544 U.S. at 347).

Here, plaintiffs sufficiently allege both that the price of Comverse stock declined when the truth regarding the defendants' fraudulent statements was revealed, and that the decline in the price of Comverse stock caused plaintiffs to suffer damages when they sold shares at a loss. Plaintiffs specifically allege several instances where the defendants made corrective disclosures that led to the immediate decline in the company's stock price. In particular, plaintiffs pled factual details regarding disclosures on March 14, 2006, March 18, 2006, April 17, 2006, May 4, 2006, June 12, 2006, November 5, 2007, January 11, 2008, and January 17, 2008, and the specific amount that the stock price declined immediately following those disclosures. Plaintiffs have also adequately pled that they purchased shares of Comverse stock at inflated prices, and that they were harmed when the truth was revealed. These pleadings, which are much more extensive than the pleadings in *Joffee*, sufficiently allege that plaintiffs suffered financial losses when the price of Comverse stock declined, and that the decline was caused by the revelation of defendants' fraudulent backdating and accounting scheme.

E. *Reasonable Reliance*

The defendants argue that plaintiffs' claims should be dismissed because plaintiffs have failed to adequately plead reasonable reliance after Comverse made corrective disclosures on April 17, 2006 and November 14, 2006.

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 522 U.S. 148, 159 (2008). Such reliance must be "reasonable." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 438 (S.D.N.Y. 2001). Reliance is also an element of Maverick's Section 18 claim

which, unlike Section 10(b), pertains only to SEC filings and requires proof that Maverick actually read and relied on the filings.  *See* 15 U.S.C. 78r(a); *Cohen*, 722 F. Supp. 2d at 433-34; *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 283 (3d Cir. 2006).

Maverick has adequately pled actual reliance on the defendants' material misstatements.  In addition, for purposes of its claims under Sections 10(b) and 20(a), it has adequately pled a prima facie case for a presumption of reliance.  With regard to actual reliance, Maverick alleges that it read and/or listened to and relied upon the defendants' false and misleading statements before investing tens of millions of dollars in Comverse shares.  At this stage, I cannot say that plaintiffs' trading pattern makes it implausible that they read and relied upon defendants' misstatements when purchasing Comverse stock.  This alone is a sufficient allegation of actual reliance for purposes of surviving a motion to dismiss.

The defendants argue that Maverick is a sophisticated investor and thus could not have reasonably relied on the Company's financial statements for purchases of Comverse stock that post-date the Company's April 17, 2006 announcement that it would record additional non-cash charges for stock-based compensation in prior periods, and that its financial statements for fiscal years 2001 to 2004 and the first three quarters of fiscal year 2005 "should no longer be relied upon."  In essence, the defendants invoke the "truth-on-the-market" defense, arguing that sophisticated investors should have been aware of the truth from the information that was publicly available.

The truth-on-the-market defense states that "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."  *Ganino*, 228 F.3d at 167.  A defendant is entitled to rely on the truth-on-the-market defense if it can prove that "the truth of the matter was already known" and was

"conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.* (internal quotation marks omitted).

Although the facts may eventually establish that the April 17, 2006 statement conveyed the truth about the defendants' fraudulent scheme to the public with sufficient detail and intensity to negate the effect of the fraudulent disclosures, it would be inappropriate to make such a finding at this stage. As Judge Garaufis found in the Class Action, a factfinder could reasonably find that defendants' disclosures and warnings that the Company's financial statements should no longer be relied upon "may not have been intense or credible enough to 'counter-balance effectively' Comverse's previous misstatements." *Comverse*, 543 F. Supp. 2d at 150 (quoting *Ganino*, 228 F.3d at 167). If that were the case, defendants would not be entitled to the truth-on-the-market defense, regardless of the level of sophistication of a particular plaintiff.

In addition, even if plaintiffs had not adequately pled actual reliance, they have sufficiently pled facts that entitle them to invoke the fraud-on-the-market presumption of reliance. At least for purposes of plaintiffs' claims under Sections 10(b) and 20(a), this presumption would satisfy their burden of pleading reliance unless defendants are able to rebut the presumption by showing that the misrepresentations did not lead to a distortion of price, or that plaintiffs traded despite knowing defendants' statements were false. *Basic Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988).

The fraud-on-the-market presumption is based on the premise that, when a security is traded on an efficient market, "public information is reflected in the market price of the security," and investors who buy or sell securities at the market price are presumed to rely

upon that public information when they rely upon the stock price. *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 (2d Cir. 2008) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761, 769 (2008)); *Basic*, 485 U.S. at 247. A plaintiff may rely on the fraud-on-the-market presumption if it establishes that the market for the stock was efficient and that the misrepresentations were publicly made and material. *In re Salomon Analyst Metromedia Litig.*, 544 F.3d at 479. Purchasing at the price set by an efficient market not only establishes reliance, but also that the reliance was reasonable. *Basic*, 485 U.S. at 244; *Comverse*, 543 F. Supp. 2d at 149-50. Here, plaintiffs have alleged that the market for Comverse stock was efficient, and a reasonable factfinder could find that the defendants' misstatements were not rendered immaterial by subsequent partial disclosures of the truth. *Comverse*, 543 F. Supp. 2d at 150-52.

Defendants argue that Maverick is not entitled to a fraud-on-the-market presumption because it is a sophisticated investor, and therefore is subject to an "enhanced duty to obtain available information material to investment decisions." *Comverse*, 543 F. Supp. 2d at 152 n.16 (citing *Livent*, 151 F. Supp. 2d at 439). This argument fails for two reasons.

First, to the extent the defendants are arguing that plaintiffs were not entitled to rely on the market price of the Company's securities because negative information about the Company was publicly available, they misconstrue the fraud-on-the-market presumption. The fraud-on-the-market presumption assumes that all publicly available information is reflected in the stock price of any security that is traded on an efficient market. *In re Salomon Analyst Metromedia Litig.*, 544 F.3d at 481 (citing *Basic*, 485 U.S. at 246). Therefore, even though negative information about the Company was publicly available when Maverick purchased Comverse shares, it is presumed that the price paid by Maverick reflected that negative

23

information.  However, if the market price was inflated because of defendants' material misstatements, the presumption allows anyone who purchased shares on an efficient market to claim that he or she relied on the misstatements by relying on the integrity of the market to reflect all publicly available information.  *Basic*, 485 U.S. at 247.  This rebuttable presumption is available to purchasers regardless of whether the purchaser was actually aware of the material misstatement (or any other publicly available information about the Company).[2]

Second, to the extent the defendants argue that Maverick was required to seek out information beyond what was publicly available, defendants seek to impose a requirement on sophisticated investors that is inconsistent with the philosophy of disclosure at the heart of the Exchange Act.  In support of this argument, the defendants cite to a footnote in Judge Garaufis' Class Action opinion, which suggests that the vulture funds in *Livent* were distinguishable from the purchasers of Comverse stock because (1) the vulture funds were sophisticated investors, they could not simply rely on the market price of the notes they were buying, and (2) the defendant's corrective disclosure was significantly stronger than the April 17, 2006 Press Release.  *Comverse*, 543 F. Supp. 2d at 152 n.16.  Citing the first of these two reasons, the defendants argue that Maverick is not entitled to the fraud-on-the-market presumption because Maverick, like the vulture funds in *Livent*, was a sophisticated investor, and was therefore required to seek out information and make a fair determination of the value of the shares.

---

[2]    Even if plaintiffs were engaged in program trading that involved the trading of securities based entirely on their prices in relation to each other, and not on the underlying fundamentals of the companies whose stocks were being traded, plaintiffs would still be entitled to rely on the fraud-on-the-market presumption in support of their claims under Sections 10(b) and 20(a).  Although the fraud-on-the-market presumption is supported by considerations of fairness, public policy, probability and judicial economy, *Basic*, 485 U.S. at 245, it is also based on the theory that "investors rely on the market price of securities as an accurate measure of their intrinsic value." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).  In this regard, there is nothing inherently implausible about program traders taking advantage of the fraud-on-the-market presumption.

While the court in *Livent* recognized that sophisticated investors have an enhanced duty to obtain material information about their investment decisions, that duty only requires such investors to obtain "available" information. *Livent*, 151 F. Supp. 2d at 371. This enhanced duty is limited to situations where "basic inquiries would have revealed the truth," or where the plaintiff was "practically faced with the facts when entering a transaction." *Id.* (internal quotation marks omitted); *see also Compania Sud-Americana de Vapores, S.A., v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 420 (S.D.N.Y. 1992) (plaintiff could not have reasonably relied on defendants' fraudulent exchange rate tables because accurate tables were published in newspapers that plaintiff read on a daily basis). When matters are peculiarly within the knowledge of the defendant, a plaintiff may rely on a defendant's representations without conducting an investigation.[3] *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (1980).

Furthermore, almost all of the cases in which courts have found that a sophisticated investor had an enhanced duty to investigate involved face-to-face transactions, not purchases on an open securities market. *See, e.g.*, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) (private placement of complex securities); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997) (agreement to purchase bank debt); *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98-99 (2d Cir. 1997) (broad licensing agreement to use artist's artwork, name and likeness on various merchandise). Here, all of Maverick's purchases were made on an open market. Maverick was thus entitled to rely on all publicly available information regarding the Company to the same extent as any other unsophisticated investor who purchased Comverse stock on an open market during the relevant

---

[3] Although the court in *Livent* stated that sophisticated investors sometimes have a duty to investigate, the court did not require the plaintiffs in that case to uncover any information that was not publicly available.

period.  The mere fact that Maverick is a sophisticated investor does not require it to seek out information above and beyond what was publicly available before purchasing the Company's stock.[4]  Such a requirement would undermine the purpose of the Exchange Act, which relies on a "philosophy of full disclosure" to "to insure honest securities markets and thereby promote investor confidence."  *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (quoting *United States v. O'Hagan*, 521 U.S. 642, 658 (1997) and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)).

F.  *PSLRA Safe Harbor*

Comverse and the individual defendants (with the exception of Dahan and Aronovitz, who are not alleged to have violated the Exchange Act) argue that any statements regarding the defendants' expectation that Comverse would become current in its filings with the SEC by the end of its 2007 fiscal year cannot form the basis of plaintiffs' claims under Sections 10(b) and 18 because such statements are protected by the PSLRA's statutory safe harbor for forward-looking statements.  15 U.S.C. § 78u-5(c).

Under the PLSRA, where a private action "is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading," a defendant "shall not be liable with respect to any forward-looking statement . . . if and to the extent that":

(A) the forward-looking statement is
(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
(ii) immaterial; or

<hr>

[4]     Even if Maverick had been required to seek out information beyond what was publicly available, plaintiffs allege that they spoke directly with several of the defendants, and that the defendants "continually downplayed the significance of any identified accounting or backdating irregularities."  (Compl. ¶ 198.)

(B) the plaintiff fails to prove that the forward-looking statement –
(i) if made by a natural person, was made with actual knowledge by that person
that the statement was false or misleading; or
(ii) if made by a business entity; was –
(I) made by or with the approval of an executive officer of that entity; and
(II) made or approved by such officer with actual knowledge by that officer that
the statement was false or misleading.

15 U.S.C. s 78u-5(c)(1)(a). The statutory definition of a forward-looking statement includes "a statement of the plans and objectives of management for future operations" or "any statement of the assumptions underlying or relating to any statement" of those plans or objectives. 15 U.S.C. § 78u-5(i)(1)(B), (D). Plaintiffs do not contest that the 2007 statements were accompanied by meaningful cautionary statements. Nor do they contest that defendants did not have actual knowledge that the statements were false or misleading. Rather, plaintiffs argue that the statements misrepresented present facts, thus making the statements ineligible for the statutory safe-harbor.

There is no doubt that defendants' 2007 statements are, at least in part, forward-looking. Defendants' statements that they "expect to become current in our filings with the SEC by the end of fiscal 2007" clearly express the defendants' expectations regarding a future event, namely, the Company becoming current with its SEC filings by the end of fiscal 2007. Plaintiffs, however, argue that another portion of defendants' statements is not forward-looking, and therefore not protected by the safe harbor. Specifically, they cite the defendants' statements that they "continue to make substantial progress towards the restatement," which plaintiffs contend were false statements of present fact because Comverse had not made substantial progress on the restatement and was actually years away from being able to become current with its SEC filings. (Pls.' Consolidated Mem. Law Opp. to Defs.' Mot. Dismiss ("Pls.' Opp.") at 21.) According to plaintiffs, Dahan's admission in August 2010 that the "fraud was everywhere"

demonstrates that "Dahan, Aronovitz and Comverse knew the Officer Defendants had engaged in widespread accounting manipulations and criminal conduct, but, nonetheless, reassured investors Comverse would soon restate." (*Id.* at 22.)

Mixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008); *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005); *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 n.97 (S.D.N.Y. 2010). However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009). "Such an assertion is necessarily implicit in every future projection." *Id.*

Here, the present tense portions of defendants' statements are so vague as to be inseparable from the forward-looking portions of the statements. It is implicit in defendants' statements regarding their expectation that the Company would become current in their filings with the SEC by the end of fiscal 2007 that they were making progress towards that goal. Absent more specific factual claims regarding what progress was being made, defendants' present-tense statements are too vague to be independently actionable.

Because plaintiffs conceded at oral argument that they would be unable to maintain their federal securities claims for the 2007 purchases if defendants' 2007 statements were deemed forward-looking statements protected by the PSLRA, defendants' motion to

dismiss plaintiffs' Exchange Act claims is granted insofar as it relates to losses plaintiffs suffered on Comverse stock purchased in 2007.

G. *Sufficiency of the Section 10(b) and Rule 10b-5 Allegations Against the CAC Defendants*

The CAC Defendants argue that plaintiffs' claim under Section 10(b) and Rule 10b-5 should be dismissed against them because plaintiffs do not plead facts raising a strong inference of scienter.[5]

Under the PSLRA, a plaintiff must plead facts that support a strong inference of scienter. 15 U.S.C. 78u-4(b)(2). In order to state a strong inference of scienter, the inference "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 314 (2007). In applying this standard, the court must consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

In this case, plaintiffs adequately allege that the CAC defendants were aware of the fraudulent backdating scheme when they signed unanimous consent forms allowing the Company to issue backdated option grants. Plaintiffs allege that the CAC Defendants were solely responsible for determining the grant dates for Comverse's stock options, but ceded this responsibility to Alexander and then knowingly approved back-dated option grants by signing unanimous written consent forms that had been backdated. The terms of the incentive plans the CAC Defendants were charged with administering, which they presumably read, indicate that

---

[5] The CAC Defendants also argue that they cannot be held liable for conduct that took place after April 30, 2007, when Friedman and Oolie resigned from the Comverse board. Because I find that plaintiffs' Section 10(b) and Rule 10b-5 claims based on statements made in 2007 are barred by the PSLRA, *see supra* Part F, I need not address that argument.

they were not empowered to grant incentive stock options with an exercise price less than the closing price of a share of Comverse's stock on the date of the grant. Nonetheless, the CAC Defendants signed the unanimous consent forms with the "as of [date]" lines that reflected purported grant dates six to fifty-seven days in the past, and then signed their individual copies of the unanimous consent forms without filling in the date of their signatures.

As Judge Garaufis found in the Class Action, the red flags on the unanimous consent forms suggesting fraud "make it at least as plausible that Friedman, Oolie and Hiram were aware of, but ignored, a strong likelihood of wrongdoing when they signed the unanimous consent forms than that they were merely negligent and unaware that a fraud was being committed." 543 F. Supp. 2d at 144. Judge Garaufis therefore found that the facts alleged by the plaintiffs in the Class Action gave rise to "a 'strong inference' that Friedman, Oolie and Hiram acted recklessly – that is, that the danger that they were committing fraud by signing the unanimous consent forms was 'so obvious that [they] must have been aware of it.'" *Id.* at 145 (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)). For the same reasons, plaintiffs' allegations that the CAC defendants acted knowingly or with reckless disregard for the truth when they signed their unanimous consent forms and returned them to Comverse raise a strong inference of scienter.

H. *Control Person Liability Under Section 20(a)*

The Officer Defendants (Alexander, Kreinberg and Sorin) and the CAC Defendants (Friedman, Hiram and Oolie) move to dismiss plaintiffs' control person liability claim under Section 20(a) of the Exchange Act. In order to establish a prima facie case of control person liability under Section 20(a) of the Exchange Act, a plaintiff must show (1) a primary violation by the controlled person; (2) control of the primary violator by the defendant;

and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

As discussed above, plaintiffs have adequately pled a primary violation of the federal securities laws by Comverse for statements made in 2006 (as well as loss causation for shares purchased prior to June 12, 2006), but have failed to adequately plead a primary violation based on defendants' 2007 statements because those claims are barred by the PSLRA, and have failed to plead loss causation for the period between June 12, 2006 and August 30, 2007. Plaintiffs have therefore adequately pled the first element of a control person liability claim for shares purchased prior to June 12, 2006. The CAC Defendants do not dispute that plaintiffs have adequately pled the second and third element of the claim. Therefore, their motion to dismiss plaintiffs' control liability claim is granted with regard to losses plaintiffs suffered after June 12, 2006, but denied with regard to losses plaintiffs suffered prior to June 12, 2006.

The Officer Defendants, like the CAC Defendants, do not dispute that plaintiffs have adequately pled the third element of their control liability claim. Nor do they dispute that plaintiffs have adequately pled that they were control persons for violations that occurred during the period in which they served as officers of Comverse. They argue only that they cannot be considered control persons during the period subsequent to their departures from Comverse on or about May 1, 2006.

The Officer Defendants are correct that, absent evidence that they continued to control Comverse after stepping down as officers, they cannot be liable as control persons for the period after they left the Company. *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 497-98 (S.D.N.Y. 2005). However, this provides no reason to dismiss plaintiffs' Section 20(a) claim

against them for the period between May 1, 2006 and June 12, 2006. Plaintiffs have adequately

pled that the Officer Defendants were control persons until they left the Company in or around

May 2006, during which time the Company engaged in the alleged fraudulent scheme and filed

numerous fraudulent financial statements with the SEC. They may be held liable as control

persons for the fraudulent disclosures that occurred while they were officers, including material

misstatements concerning the Company's financial statments as well as partial disclosures that

continued to conceal the nature and scope of the fraud. Even if the Company did not fully

disclose the nature and scope of the fraud until sometime after May 2006, or made additional

fraudulent statements that helped conceal the nature and scope of the fraud after that date, that

would not excuse the Officer Defendants from control person liability for the fraudulent

disclosures (or omissions) while they were officers. And because plaintiffs allege that fraudulent

statements between 2001 and 2005 caused the Company's stock price to be artificially inflated,

and statements between April 2006 and June 12, 2006 merely revealed aspects of the initial fraud

that had previously been concealed, the Officer Defendants could still be held liable for

plaintiffs' pre-June 12, 2006 losses based on their control of the Company prior to their

departures in or around May 1, 2006. Therefore, the Officer Defendants' motion to dismiss

plaintiffs' control person liability claim is granted with regard to losses plaintiffs suffered after

June 12, 2006, but denied with regard to losses plaintiffs suffered prior to June 12, 2006.

I. *Negligent Misrepresentation Claims*

All defendants move to dismiss plaintiffs' negligent misrepresentation claim.

Because the legal analysis differs for the statements made prior to 2007 and the statements made

in 2007, I review them separately.

1.  *The Pre-2007 Statements*

With regard to the pre-2007 statements, all defendants argue that plaintiffs' negligent misrepresentation claim should be dismissed because plaintiffs have not pled a plausible claim for relief or reasonable reliance. For the same reasons discussed in Part B, *supra*, with regard to plaintiffs' Exchange Act claims, I reject this argument.

In addition, the CAC defendants argue that the only statement that can be attributed to any of them is the March 14, 2006 statement by Friedman that the problems at Comverse were limited to options backdating similar to that at other technology companies. The CAC defendants argue that the negligent misrepresentation claim should be dismissed against Hiram and Oolie because plaintiffs have not alleged that either defendant made any negligent misrepresentations, and that it should be dismissed against Friedman because plaintiffs have failed to adequately allege that Friedman knew or should have known that the March 14, 2006 statement was false, and have failed to allege that plaintiffs reasonable relied on the statement.

The CAC defendants are incorrect in asserting that the March 14, 2006 statement is the only misrepresentation that can be attributed to them. Plaintiffs allege that all three of the CAC defendants signed certain of Comverse's false and misleading filings with the SEC, thereby making false statements that may have misled investors. Although it is possible that plaintiffs will be unable to establish a special relationship between the CAC defendants and plaintiffs with regard to statements made in SEC filings, *see In re JWP, Inc. Sec. Litig.*, 928 F. Supp. 1239, 1261-62 (S.D.N.Y. 1996), the CAC defendants have not moved to dismiss plaintiffs' negligent misrepresentation claim on that ground. Because plaintiffs' negligent misrepresentation claim against the CAC defendants may proceed based on the SEC filings, I need not decide at this stage whether plaintiffs have adequately alleged that Freidman knew or should have known that

the problems at Comverse were not limited to options backdating similar to that at other technology companies, or whether plaintiffs reasonably relied on that statement.

### 2. *The 2007 Statements*

With regard to the 2007 statements, Comverse and the New Management Defendants (Dahan and Aronovitz) argue that all but one of the alleged statements giving rise to the claim are time-barred. In addition, they move to dismiss plaintiffs' negligent misrepresentation claim on the grounds that the statements are not present statements of fact, but are, instead, statements of expectation about the future filing of financial statements.

### a. *The Negligent Misrepresentation Claims Based on the 2007 Statements Are Not Time-Barred*

New York applies a three-year statute of limitations to claims that involve an "injury to property," N.Y. C.P.L.R. § 214(4), and a six-year statute of limitations to claims that are "based upon fraud," N.Y. C.P.L.R. § 213(8), as well as those "for which no limitations is specifically prescribed by law," N.Y. C.P.L.R. § 213(1). New York courts have generally applied the six-year limitations period to negligent misrepresentation claims that are related to fraud claims, although they have not definitely established whether the limitations period is based on § 213(8) (claims based on fraud) or § 213(1) (claims without a prescribed limitations period). *Compare Reilly Green Mountain Platform Tennis v. Cortese*, 28 Misc.3d 1234(A), Slip Copy, 2007 WL 7263362, at *10-11 (Table) (holding that "the six year statute [for fraud] applies where the negligent misrepresentation claim is closely aligned with an intentional misrepresentation claim") *with Fandy Corp. v. Lung-Fong Chen*, 262 A.D.2d 352, 352-53, 691 N.Y.S.2d 572, 573 (2d Dep't 1999) (negligent misrepresentation claim covered by six-year limitations period under § 213(1)); *Milin Pharmacy, Inc. v. Cash Register Systems, Inc.*, 173

A.D.2d 686, 687, 570 N.Y.S.2d 341, 341 (2d Dep't 1991) (same).  Regardless of which sub-section of § 213 provides the limitations period for negligent misrepresentation claims, the six-year limitations period applies to plaintiffs' negligent misrepresentation claims because the claims are closely aligned with plaintiffs' intentional fraud claims.  Therefore, plaintiffs' negligent misrepresentation claims against the New Management Defendants, which were filed less than six years after all of the relevant statements were made, are not barred by New York's statute of limitations.

b.  *The 2007 Statements Are Not Factual in Nature*

Even though plaintiffs' negligent misrepresentation claim based on the 2007 statements is not time-barred, none of the statements defendants allegedly made in 2007 can serve as the basis for a negligent misrepresentation claim.

Under New York law, the elements of a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.  *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).  "The alleged misrepresentations must be factual in nature and not promissory or relating to future events that might never come to fruition."  *Id.* at 20-21; *Sheth v. New York Life Ins. Co.*, 273 A.D.2d 72, 74, 709 N.Y.S.2d 74, 75 (1st Dep't 2000) ("The purported misrepresentations relied upon by plaintiffs may not form the basis of a claim for fraudulent and/or negligent misrepresentation since they are conclusory and/or constitute mere puffery, opinions of value or future expectations."); *Bango v. Naughton*, 184 A.D.2d 961, 963,

584 N.Y.S.2d 942, 944 (3d Dep't 1992) (negligent misrepresentation claim was properly dismissed for failure to state a claim because the alleged representations were "mere expressions of future expectation"); *Margrove Inc. v. Lincoln First Bank of Rochester*, 54 A.D.2d 1105, 1107, 388 N.Y.S.2d 958, 960 (4th Dep't 1976) ("The alleged negligent misstatements all relate to promised future conduct, if misstatements they be, and there is a lack of any element of misrepresentation as to an existing material fact so as to come within the doctrine of negligent misrepresentation . . . .").

As discussed in Part F, *supra*, the statements by the New Management Defendants in 2007 were all forward-looking statements regarding defendants' expectations that the Company would be able to become current with its SEC filings by the end of fiscal 2007. The 2007 statements, therefore, cannot serve as the basis for a negligent misrepresentation claim under New York law.

Plaintiffs argue that non-factual statements are still actionable if they are made in bad faith or are not reasonably supported by the available evidence. (Pls.' Opp. at 21.) However, the case plaintiffs cite in support of this argument deals with opinion statements, not statements predicting future events. *ADL, LLC v. Tirakian*, 06-cv-5076, 2010 WL 3925131, *12 (E.D.N.Y. August 26, 2010). There is no authority for the proposition that forward-looking statements may serve as the basis for a negligent misrepresentation claim under New York law. Furthermore, to the extent that plaintiffs argue that their negligent misrepresentation claim concerning the 2007 statements should be sustained because the defendants acted intentionally or recklessly, plaintiffs' complaint expressly disclaims any claim of fraud or intentional misconduct with regard to its negligent misrepresentation claim.

Plaintiffs also argue that defendants' forward-looking statements are actionable because defendants negligently applied or ignored then-existing facts. In support of this argument, plaintiffs cites to a New York Court of Appeals case, *Kimmell v. Schaefer*, 89 N.Y.2d 257, 652 N.Y.S.2d 715 (1996). However, as the Second Circuit recognized in *Hydro Investors, Inc. v. Trafalgar Power Inc.*, "the issue before the Court of Appeals [in *Kimmell*] was whether the relationship between the defendant and plaintiff would support a negligent misrepresentation claim, not whether the alleged statements qualified as representations of existing fact or future promises." 227 F.3d at 21 n.1. In addition, the Second Circuit noted that, to the extent the Appellate Division had held that future predictions or projections could qualify as the basis for a negligent misrepresentation claim, "that finding is contrary to the great weight of authority." *Id*. Because plaintiffs' argument is not supported by New York law, and has been explicitly rejected by the Second Circuit, it does not provide a basis for maintaining a negligent misrepresentation claim based on the 2007 statements. Therefore, defendants' motion to dismiss plaintiffs' negligent misrepresentation claim against Dahan and Aronovitz is granted, and defendants' motion to dismiss plaintiffs' negligent misrepresentation claim against all other defendants is granted insofar as plaintiffs' claim is based on defendants' 2007 statements.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss plaintiffs' Exchange Act claims and negligent misrepresentation claim against Comverse, Alexander, Kreinberg, Sorin, Friedman, Hiram and Oolie is granted insofar as plaintiffs' claims are based on defendants' 2007 statements and denied in all other respects. Defendants' motion to dismiss plaintiffs' negligent misrepresentation claim against Dahan and Aronovitz is granted.

So Ordered.

John Gleeson, U.S.D.J.

Date:  July 12, 2011
        Brooklyn, New York